1 | Lionel Z. Glancy (Bar No. #134180)
Michael Goldberg (Bar No. #188669)
2 | info@glancylaw.com
GLANCY BINKOW & GOLDBERG
3 | LLP
1801 Ave. of the Stars, Suite 311
4 | Los Angeles, CA 90067
Telephone: (310) 201-9150
5 | Facsimile: (310) 201-9160

6 | Bernard Persky
bpersky@labaton.com
7 | Hollis L. Salzman
hsalzman@labaton.com
8 | Eric J. Belfi
ebelfi@labaton.com
9 | Greg Asciolla
gasciolla@labaton.com
10 | Kellie Lerner
klerner@labaton.com
11 | William V. Reiss
wreiss@labaton.com
12 | LABATON SUCHAROW LLP
140 Broadway
13 | New York, NY 10005
Telephone: (212) 907-0700
14 | Facsimile: (212) 818-0477

15 | *Attorneys for Plaintiffs and the Proposed Classes*

16

17 | **IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

18 | **CV10 2319 VBF (RCx)**

19 | BOARD OF TRUSTEES OF THE
20 | GALVESTON WHARVES; BOARD
OF COMMISSIONERS OF THE PORT
21 | OF NEW ORLEANS and OSG
22 | LIGHTERING LLC on Behalf of
Themselves and all Others Similarly
23 | Situated,
24 |
Plaintiffs,
25 |
26 | vs.
27 |
TRELLEBORG AB; VIRGINIA
28 | HARBOR SERVICES, INC. D/B/A

) **CIVIL ACTION NO.:**
)
)
)
)
)
)
) **CLASS ACTION COMPLAINT**
)
) **JURY TRIAL DEMANDED**
)
)
)
)
)
)
)

COPY

CLASS ACTION COMPLAINT

1   SEAWARD; SEAWARD                         )
2   INTERNATIONAL INC.; SEAWARD              )
    HOLDINGS, INC.; FENTEK MARINE            )
3   SYSTEMS GMBH; URETHANE                   )
    PRODUCTS CORPORATION;                    )
4   MARINE FENDERS                           )
5   INTERNATIONAL, INC.;                     )
    WATERMAN SUPPLY COMPANY,                 )
6   INC.; NEXTWAVE MARINE LLC;               )
7   PLASTIC PILINGS, INC.; MARITIME          )
    INTERNATIONAL, INC.; FRANK               )
8   MARCH; ROBERT B. TAYLOR;                 )
9   DONALD MURRAY; PETER                     )
    NILSSON; WILLIAM ALAN POTTS;             )
10  GERALD THERMOS; SEYMOUR                  )
11  WATERMAN; ANDREW                         )
    BARMAKIAN; JOHN DEATS;                   )
12  TOMAS CRAWAACK; PROMAR                   )
13  (A.K.A PROMAR LLC OR PROMAR              )
    CORP.); FENDERCARE MARINE                )
14  SOLUTIONS; JAMES FISHER PLC;             )
15  THE YOKOHAMA RUBBER                      )
    COMPANY, LTD.; BRIDGESTONE               )
16  CORPORATION; BRIDGESTONE                 )
17  INDUSTRIAL PRODUCTS AMERICA,)
    INC. and SUMITOMO RUBBER                 )
18  INDUSTRIES, LTD.,                        )
19                                           )
                       Defendants.           )
20                                           )
                                             )
21

22          Plaintiffs, Board of Trustees of the Galveston Wharves; Board of

23  Commissioners of the Port of New Orleans and OSG Lightering LLC

24  ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this

25  action for treble damages and costs of suit under the antitrust laws of the United

26  States against Trelleborg AB; Virginia Harbor Services, Inc. d/b/a SEAWARD;

27  Seaward International Inc.; Seaward Holdings, Inc.; Fentek Marine Systems

28  GmbH; Urethane Products Corporation; Marine Fenders International, Inc.;

1  Waterman Supply Company, Inc.; Nextwave Marine LLC; Plastic Pilings, Inc.;

2  Maritime International, Inc.;  Frank March; Robert B. Taylor; Donald Murray;

3  Peter Nilsson; William Alan Potts; Gerald Thermos; Seymour Waterman; Andrew

4  Barmakian; John Deats; Tomas Crawaack; ProMar (a.k.a. ProMar LLC or ProMar

5  Corp.); The Yokohama Rubber Company, Ltd.; FenderCare Marine Solutions;

6  Bridgestone Corporation; Bridgestone Industrial Products America, Inc.; James

7  Fisher PLC; and Sumitomo Rubber Industries, Ltd. ("Defendants") and allege, on

8  information and belief, but on personal knowledge as to allegations relating to

9  Plaintiffs, as follows:

**NATURE OF CLAIM**

10

11      1.      This case arises from three related and overlapping conspiracies

12  involving several marine products.  As set forth below, the conspiracies were

13  intertwined and consisted of many of the same Defendants and related products.

14      2.      The first conspiracy involves an unlawful agreement to fix prices, rig

15  bids and allocate the market in the United States for foam-filled marine fenders and

16  ancillary products ("Foam-Filled Fenders") and foamed-filled buoys and ancillary

17  products ("Buoys") (together, "Foam-Filled Fenders and Buoys").

18      3.      The second conspiracy involves a similar unlawful agreement to fix

19  prices, rig bids and allocate the market in the United States for plastic marine

20  pilings and ancillary products ("Marine Pilings").

21      4.      The third conspiracy involves an unlawful agreement to fix prices, rig

22  bids and allocate the market in the United States for marine fenders and ancillary

23  products other than Foam-Filled Fenders, including but not limited to, fixed

24  fenders and pneumatic fenders ("Marine Fenders").

25      5.      As a result of these illegal conspiracies, Defendants charged supra-

26  competitive prices for Foam-Filled Fenders and Buoys, Marine Pilings, and Marine

27  Fenders in the United States thereby injuring Plaintiffs and members of the Foam

28

1    Filled Fenders and Buoys Class (defined below), Marine Pilings Class (defined

2    below), and Marine Fenders Class (defined below) (collectively, the "Classes").

3         6.    As set forth below, Defendants Virginia Harbor Services, Inc., Frank

4    March, Robert B. Taylor, Donald Murray, William Alan Potts, Gerald Thermos,

5    and Andrew Barmakian have already pleaded guilty to engaging in a conspiracy to

6    unlawfully rig bids and allocate markets for the sale of Foam-Filled Fenders and

7    Buoys and/or Marine Pilings  pursuant to a criminal investigation launched by the

8    United States Department of Justice's Antitrust Division ("DOJ").

9         7.    Additionally, on July 22 2009, the DOJ as well as the States of Florida

10   and California intervened in a pending qui tam lawsuit brought by whistleblower

11   Douglas Farrow, a current executive of Defendant Urethane Products Corporation.

12        8.    The qui tam lawsuit, which was filed in 2005, was partially unsealed

13   by Judge George H. Wu of the U.S. District Court of the Central District of

14   California on February 19, 2010.

15        9.    On February 26, 2010, the DOJ announced that it had negotiated

16   settlements with several of the Defendants.  Trelleborg AB and four of its

17   subsidiaries agreed to pay $14 million to settle the qui tam action that alleged they

18   participated in an unlawful conspiracy to fix prices, rig bids and allocate markets

19   for marine hose, Foam-Filled Fenders and Buoys, Marine Pilings, and Marine

20   Fenders purchased by the U.S. Navy and other federal departments and agencies.

21        10.   In addition, Defendants Bridgestone Industrial Products America, Inc.

22   Corp. and The Yokohama Rubber Co. Ltd. contributed $178,108 and $173,410

23   respectively to settle the qui tam action.

24                        **JURISDICTION AND VENUE**

25        11.   This action arises under Section 1 of the Sherman Act and Section 4

26   of the Clayton Act, 15 U.S.C. §§ 1 and 15.

27        12.   This Court has jurisdiction under Sections 4 and 12 of the Clayton

28   Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1331 and 1337.

1    13.    Venue is proper in this District pursuant to Sections 4 and 12 of the

2    Clayton Act, §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and (d).  Defendants

3    are found and transact business in the District and/or the claims arose at least in

4    part in the District.  Defendants regularly and continuously conduct business in

5    interstate and foreign commerce between and among the United States and foreign

6    countries.  The interstate trade and commerce relevant to this action has been

7    carried out, in part, within the District.

8                                **PARTIES**

9    14.    Plaintiff, Board of Trustees of the Galveston Wharves ("Port of

10   Galveston") is a public agency of the City of Galveston.  During the Foam-Filled

11   Fenders and Buoys Class Period (defined below),  Plaintiff purchased Foam-Filled

12   Fenders and/or Buoys directly from one or more of the Foam-Filled Fenders and

13   Buoys Defendants (defined below) and was damaged as a result of the Foam-Filled

14   Fenders and Buoys Defendants' and their co-conspirators' unlawful conduct.

15   15.    Plaintiff, the Board of Commissioners of the Port of New Orleans

16   ("Port of New Orleans"), is a political subdivision of the State of Louisiana created

17   by La. R.S. 34:1 et. seq., for the purposes of regulating commerce and traffic of the

18   Port and Harbor of New Orleans.  During the Marine Pilings Class Period (defined

19   below), Plaintiff purchased Marine Pilings directly from one or more of the Marine

20   Pilings Defendants and was damaged as a result of the Marine Pilings Defendants'

21   and their co-conspirators' unlawful conduct.

22   16.    Plaintiff, OSG Lightering LLC ("OSG Lightering"), is a limited

23   liability company with its headquarters in  Houston, Texas.  During the Marine

24   Fenders Class Period (defined below), Plaintiff purchased Marine Fenders directly

25   from one or more of the Marine Fenders Defendants and was damaged as a result

26   of the Marine Fenders Defendants' and their co-conspirators' unlawful conduct.

27   17.    Defendant Trelleborg AB (a.k.a. Trelleborg Group) ("Trelleborg") is a

28   business organization with headquarters in Trelleborg, Sweden and business

operations at locations throughout the world, including the United States and Germany.   Trelleborg AB is comprised of four business units that each provide polymer or rubber products to a broad range of industries.  Trelleborg AB's marine operations are organized within the Trelleborg Engineered Systems ("TES") business unit.

18.     Defendant Seaward International Inc. ("SII") is a corporation organized under the laws of the State of Virginia, with offices located in Clear Brook, Virginia.

19.     Defendant Seaward Holdings, Inc. ("SHI") is a corporation organized under the laws of the State of Virginia, with offices located in Clear Brook, Virginia.  Plaintiffs are informed and believe that SHI acquired SII in 1999 and that SHI dominates and controls SII.  The term "Seaward" herein refers to SHI and SII.  Until its acquisition by Trelleborg in December 2002, Seaward was one of the largest producers of Foam-Filled Fenders and Buoys in the United States. Plaintiffs are informed and believe that most of SHI's assets and operations, including the Seaward Foam-Filled Fenders and Buoys manufacturing operation, were acquired by Trelleborg Engineered Products, Inc. ("TEP") around December 2002.

20.     Defendant Virginia Harbor Services, Inc. d/b/a SEAWARD ("Virginia Harbor Services") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 3470 Martinsburg Pike, P.O. Box 98, Clear Brook, Virginia, 22624.  Virginia Harbor Services, previously known as TEP, is a corporate subsidiary of Trelleborg.

21.     On or about July 25, 2007, Trelleborg caused TEP to change its name to Virginia Harbor Services.  Unless stated otherwise, Virginia Harbor Services shall hereafter be referred to as "VHS/TEP."

22.     On or about December 2002, VHS/TEP acquired the business interests of Seaward.  Selling under the "Seaward" brand, Defendant Virginia

1   Harbor Services is one of the world's leading manufacturers and suppliers of

2   Foam-Filled Fenders and Buoys.

3         23.    Defendant Fentek Marine Systems GmbH ("Fentek") is a business

4   organization with its headquarters in Hamburg, Germany and offices at different

5   locations throughout the world, including an office in the State of Virginia.  Fentek

6   is part of TES and, upon information and belief, is a wholly-owned business unit of

7   Trelleborg.  Since approximately 2001, Fentek has been dominated and controlled

8   by Trelleborg.  Between at least approximately 2001 through 2006, Thomas

9   Crawaack was the company's president.  Prior to 2001, Thomas Crawaak was the

10  principal owner and operator of Fentek.

11        24.    Defendant Frank March ("March") is the majority shareholder of SHI.

12  He was the majority shareholder of SII before it was acquired by SHI, and has

13  been the alter ego of SII and SHI, respectively, during the Foam-Filled Fenders and

14  Buoys Class Period (defined below).  March actively participated in and

15  implemented  and also directed and authorized the wrongful conduct, hereinafter

16  alleged, by Seaward and VHS/TEP.  In or around December 2002, March

17  authorized the sale of Seaward's operations to Trelleborg (or one of its business

18  units) for approximately $10 million.

19        25.    Defendant Robert (a.k.a. "Bob") B. Taylor ("Taylor") was the

20  principal owner and operator of Defendant ProMar between 1997 and 1998.  In

21  1999, ProMar was acquired by SHI.  Taylor thereafter served as President of SHI

22  and held a minority interest in SII.  Around December 2002, following

23  Trelleborg's acquisition of certain of SHI's assets and operations, including the

24  Seaward Foam-Filled Fenders and Buoys manufacturing business, Taylor was

25  employed as the President of VHS/TEP and sat on its board.  Taylor, like March,

26  actively participated in and implemented and also directed and authorized the

27  unlawful conduct by Seaward and later VHS/TEP described herein.  Defendant

28  Taylor authorized and directed VHS/TEP to continue engaging in the unlawful

1    practices described herein after Trelleborg through VHS/TEP acquired Seaward's

2    operations.

3        26.     Defendant Donald Murray ("Murray") was Chief Financial Officer

4    ("CFO") of Seaward and thereafter obtained a similar position at VHS/TEP after

5    the acquisition of Seaward's operations by Trelleborg. Murray also sat on the

6    board of VHS/TEP during the Class Periods. Murray actively participated in and

7    implemented the unlawful conduct described herein.

8        27.     Defendant Peter Nilsson ("Nilsson") is the current president of

9    Trelleborg. Nilsson was President of TES between approximately June 1, 2003

10    and October 1, 2005. Prior to June 1, 2003, Nilsson was head of VHS/TEP.

11    Nilsson actively participated in and implemented the unlawful conduct described

12    herein.

13        28.     Defendant William Alan Potts ("Potts") is the former CFO of

14    VHS/TEP and held that position during the Class Periods. Potts actively

15    participated in and implemented the unlawful conduct described herein.

16        29.     Defendant Marine Fenders International ("MFI") is a corporation

17    organized under the laws of the State of California, with its principal place of

18    business located at 909 Mahar Avenue, Wilmington, California, 90744. Defendant

19    MFI is engaged in the business of manufacturing, distributing and selling Foam-

20    Filled Fenders and Buoys.

21        30.     Defendant Urethane Products Corporation ("UPC") is a corporation

22    organized under the laws of the State of California, with its principal place of

23    business located at 9076 Rosecrans Avenue, Bellflower, California, 90706. UPC

24    was founded in 1976 by Timothy Thermos. UPC manufactures, distributes and

25    sells Foam-Filled Fenders and Buoys and other marine products made from

26    polyethylene foam core with a polyurethane elastomer skin.

27        31.     Defendant Nextwave Marine LLC ("Nextwave") is a limited liability

28    company formed in June 2001 by UPC and SHI, with offices located at 521 North

1  Sam Houston Parkway East, Houston, Texas 77060.  Between at least June 2001
2  and December 2002, Nextwave knowingly acted as an agent of Seaward and UPC
3  with respect to the wrongful conduct described herein.

4        32.    Defendant Gerald Thermos ("Thermos") is an individual presently
5  residing in the State of California.  Thermos is the former president of UPC and
6  now owns and operates MFI in Wilmington, California.  Thermos actively
7  participated in and implemented the unlawful conduct described herein and
8  directed and authorized the unlawful conduct by UPC and MFI.

9        33.    Defendant Waterman Supply Company, Inc. ("WSC") is a corporation
10  organized under the laws of the State of California, with offices located at 910
11  Mahar Avenue, Wilmington, California 90744.  Defendant Waterman is a leading
12  dealer, distributor and manufacturer's representative for Foam-Filled Fenders and
13  Buoys.  Additionally, Waterman supplies manufacturers with end-fittings, or
14  "hardware," which are necessary components in producing Foam-Filled Fenders
15  and Buoys

16        34.    Defendant Seymour Waterman ("Waterman") has been and is the
17  principal owner of WSC.  Waterman actively participated in and implemented and
18  directed and authorized the unlawful conduct of WSC.

19        35.    Defendant Plastic Pilings, Inc. ("PPI") is a corporation organized
20  under the laws of the State of California with offices located in Rialto, California.
21  PPI is a leading manufacturer and supplier of Marine Pilings.

22        36.    Defendant Andrew Barmakian ("Barmakian") is an individual who
23  conducts business in Rialto, California.  Barmakian is the owner and president of
24  PPI.  Barmakian actively participated in and implemented and directed and
25  authorized the unlawful conduct of PPI.

26        37.    Defendant Maritime International, Inc. ("Maritime International") is a
27  corporation organized under the laws of the State of Louisiana.

28

CLASS ACTION COMPLAINT                            9

38.    Defendant John Deats ("Deats") is the owner of Maritime International. Deats actively participated in and implemented and directed and authorized the wrongful conduct by Maritime International described herein.

39.    Defendant Tomas Crawaack ("Crawaack") was a board member of VHS/TEP during the Class Periods. Crawaack was also the President of Fentek, which is part of the TES division of Trelleborg. Crawaack actively participated in and implemented the unlawful conduct described herein. Crawaack resides in Germany, but has conducted business in this District during the Class Periods, including the commission of the unlawful conduct described herein.

40.    Defendant ProMar (a.k.a. ProMar LLC or ProMar Corp.) is a business entity with offices located in Clearwater, Virginia, and offices formerly located in Kearneysville, West Virginia and Fort Worth, Texas.

41.    Defendant The Yokohama Rubber Company, Ltd. ("Yokohama") is a Japanese corporation with its principal offices in Tokyo, Japan.

42.    Defendant FenderCare Marine Solutions Limited ("FenderCare") is a business entity that acts as a holding company for a variety of business entities. FenderCare is based in Norfolk, Great Britain.

43.    Defendant James Fisher PLC is a public liability company formed under the laws of the United Kingdom. In March 2005, James Fisher PLC acquired the shares of FenderCare. James Fischer PLC has dominated and controlled FenderCare since its acquisition of that company. James Fisher PLC is based in Norfolk, Great Britain, but has conducted business in the United States via FenderCare. Through its acquisition of FenderCare, James Fisher PLC has assumed the liabilities of that company.

44.    Defendant Bridgestone Corporation, a manufacturer of Marine Fenders and other products, is a Japanese corporation with its principal place of business in Tokyo, Japan.

45.     Defendant Bridgestone Industrial Products America, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Nashville, Tennessee.  Bridgestone Industrial Products America, Inc. is a subsidiary of BFS Diversified Products, LLC which is a subsidiary of Bridgestone America Holdings, Inc., which is a subsidiary of Bridgestone Corporation.  The business entity Bridgestone Industrial Products America, Inc., along with its affiliated companies referenced above, are collectively referred to herein as "Bridgestone."

46.     Defendant Sumitomo Rubber Industries, Ltd. ("Sumitomo"), a manufacturer of Marine Fenders, among other products, is a Japanese company with its principal place of business in Kobe, Japan.

47.     The following Defendants, among others, participated in the conspiracy to fix prices, rig bids and allocate markets for Foam-Filled Fenders and Buoys ("Foam-Filled Fenders and Buoys Defendants"):  Trelleborg; VHS/TEP; Fentek; SII; SHI; UPC; MFI; Nextwave; WSC; Maritime International; James Fisher, PLC;  ProMar; FenderCare; Waterman; March; Taylor; Murray; Nilsson; Thermos; Deats; and Crawaack.

48.     The following Defendants, among others, participated in the conspiracy to fix prices, rig bids and allocate markets for Marine Pilings ("Marine Pilings Defendants"):  Trelleborg; SII; SHI; VHS/TEP; PPI; UPC; Thermos; Barmakian; Potts; Taylor; Crawaack; Nilsson; March and Promar.

49.     The following Defendants, among others, participated in the conspiracy to fix prices, rig bids and allocate markets for Marine Fenders ("Marine Fenders Defendants"):  Trelleborg; VHS/TEP; Fentek; ProMar; Taylor; Yokohama; FenderCare; Crawaack; Deats; James Fisher PLC; Bridgestone; Maritime; WSC; and Sumitomo.

**UNNAMED CO-CONSPIRATORS**

50.     Various other companies and individuals not named as Defendants in this Complaint participated as co-conspirators in the unlawful acts complained of, and performed acts and made statements in furtherance of the unlawful conduct.

**INTERSTATE TRADE AND COMMERCE**

51.     Throughout the Class Periods, there has been a continuous and uninterrupted flow of sales of Foam-Filled Fenders and Buoys, Marine Pilings and Marine Fenders in interstate commerce.

**THE FOAM-FILLED FENDERS AND BUOYS INDUSTRY**

52.     Foam-Filled Fenders are structural protection products that have both high energy absorption and low reaction force.  These marine devices protect ship-to-ship and ship-to-dock applications by limiting the amount of force applied to dock structures during berthing and mooring.  Foam-Filled Fenders are an integral part of protecting large multi-use docks, wharfs and piers.  They require minimal upkeep and maintenance.  Foam-Filled Fenders are equipped with permanent end fittings, ("hardware") made of steel, so that the Foam-Filled Fenders can be mounted to vessels and/or berthing facilities.

53.     Buoys are used in a variety of applications, including as channel markers and navigational aids

54.     Foam-Filled Fenders and Buoys have peculiar characteristics and uses as compared to other types of marine fenders and buoys.  These devices are fabricated from a resilient foam that allows them to absorb impact without damage to either vessel or buoy, and makes these products unsinkable, even if punctured. Due to this internal energy absorption, vessels will not rebound from the berth. Additionally, foam-filled marine products are protected by a thick outer polyurethane elastomer skin, which makes them far more resistant to the degrading effects of chemicals, ozone and oil than are other types of fendering systems.

55.     During the Foam-Filled Fenders and Buoys Class Period (defined below), Seaward (subsequently VHS/TEP), UPC and MFI were the dominant manufacturers of Foam-Filled Fenders and Buoys used for commercial applications in the United States.

## THE MARINE PILINGS INDUSTRY

56.     Marine Pilings are reinforced synthetic pilings, resembling telephone poles, that are used in port and pier construction projects.

57.     VHS/TEP and, before it Seaward have manufactured and sold Marine Pilings under the names Seapile and SI Plastic Products, among others.

58.     During the Marine Pilings Class Period (defined below), Seaward (subsequently VHS/TEP) and PPI were the primary manufacturers of Marine Pilings in the United States.

## THE MARINE FENDERS INDUSTRY

59.     In addition to Foam-Filled Fenders, other fenders marketed in the marine products industry include, but are not limited to, fixed fenders and pneumatic fenders.

60.     A pneumatic fender is an energy absorbing system used in marine safety applications to protect vessels and berthing stations from collision. Pneumatic fenders are composed of compressed air housed in a barrel-shaped bag that helps absorb impact energy.  Pneumatic fenders have valves that control and monitor air pressure which are essential to their functionality – if the internal pressure rises too high, the pneumatic fender can break, thus reducing its effectiveness.

61.     Pneumatic Fenders are suitable for a variety of applications including, but not limited to, tankers, gas carriers, bulk cargo ships, and rapid response fendering.  Pneumatic fenders float like Foam-Filled Fenders, but are typically filled with air, or in some cases, with air and water (hydro-pneumatic fenders).

62.     A fixed fender is a stationary cushion that is placed on a pier or piling to prevent damage from berthing vessels.  Fixed fenders can be used in fender systems, either attached to a dock or attached to a piling. They are manufactured in a variety of shapes and sizes with geometric configurations including, but not limited to, arches, cells, cones, cylinders, and rectangles.

### THE FOAM-FILLED FENDERS AND BUOYS CONSPIRACY

63.     Beginning at least as early as June 2000, the Foam-Filled Fenders and Buoys Defendants and their co-conspirators participated in a continuing conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain or stabilize prices, rig bids and allocate the market and customers for Foam-Filled Fenders and Buoys in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### Gerald Thermos, UPC, Frank March, Robert Taylor, and Seaward

64.     UPC was founded in 1976 by Timothy Thermos.  Upon his death in 1995, ownership of the company was transferred to his wife Elizabeth Thermos. At or about the same time, their son, Defendant Gerald ("Jerry") Thermos took over as UPC's President, a capacity in which he continued to serve until approximately April 26, 2004.

65.     Between the mid 1990s and April 2004, Seaward (subsequently VHS/TEP) and UPC were the dominant manufacturers in the United States of Foam-Filled Fenders and Buoys.

66.     Thermos served as President and Managing Director of UPC from 1995 until his resignation on April 28, 2004.

67.     In early 1999, March and Thermos communicated with each other regarding a consulting agreement, which March had presented to Thermos.  The draft consulting agreement proposed an arrangement between UPC and Seaward, by which the two would share confidential competitive information about bids and other information on pending projects.  Thermos told March in a February 1999

letter that he had been advised by UPC's antitrust counsel that the agreement was inappropriate and not acceptable. He indicated that "UPC cannot and will not discuss with you, any information concerning the pricing, terms or conditions of any bid, or our decision as to whether or not we intend to bid on a particular project."

68.     Notwithstanding Thermos' February 1999 letter, conspiratorial discussions between the parties resumed. In June 2000, Thermos met with, among others, March and Taylor in Baltimore, Maryland. March subsequently wrote to Thermos regarding the meeting and the terms of a proposed agreement pursuant to which Seaward and UPC would divide the United States market for Foam-Filled Fenders and Buoys as follows: 70% to Seaward and 30% to UPC. As part of the agreement, March's letter proposed a payment of $3 million dollars by Seaward to Thermos personally as compensation for "consulting services."

69.     On or about August 15, 2000, Taylor wrote to Thermos concerning the ongoing discussions regarding the proposed so-called "joint venture" between Seaward and UPC. The letter outlined terms acceptable to Seaward, noting that Seaward's management and owners had reviewed the main points at issue remaining between the parties. Among the terms referenced in the letter and its attachment was the same 70/30 production split previously referenced by March. An agreement was memorialized soon thereafter.

70.     Pursuant to their unlawful agreement, beginning in approximately June 2000 and continuing through April 2004, Seaward (later VHS/TEP) and UPC coordinated their pricing and bids on projects so as to: (i) distribute their cumulative manufacturing work 70% to Seaward (later VHS/TEP) and 30% to UPC, and (ii) raise the price for their products. Such a result was possible because Seaward (later VHS/TEP), UPC and/or their distributors were frequently the only Foam-Filled Fenders or Buoys suppliers bidding on the subject projects.

71.    The primary people responsible for the day-to-day execution of the unlawful scheme were Taylor at Seaward (later VHS/TEP) and Thermos at UPC. In furtherance of the scheme, Taylor and Thermos regularly exchanged correspondence concerning proposed bids, pricing and related matters during the Foam-Filled Fenders and Buoys Class Period.

72.    During the Foam-Filled Fenders and Buoys Class Period, price lists for Foam-Filled Fenders and Buoys sold by the two companies were frequently identical for comparable products.

73.    The prices charged by UPC and Seaward pursuant to the foregoing price-fixing, bid-rigging, and market allocation scheme were systematically inflated beyond the competitive prices that otherwise would have been charged absent the unlawful agreement.

74.    On or about 2001, UPC and Seaward (prior to its being purchased by Virginia Harbor Services), under the direction of Thermos and Taylor and with the knowledge and acquiescence of Seaward's CEO March, established a joint venture called Nextwave. Although Nextwave purported to be a legitimate joint venture, in reality it was established as a vehicle to unlawfully fix prices, rig bids and allocate the market and/or customers in the United States for Foam-Filled Fenders and Buoys. Seaward and UPC used Nextwave to eliminate competition by allocating customers and dividing up the contracts they wanted to win.

75.    The terms of Nextwave's operating agreement ("Operating Agreement") gave representatives of Seaward and UPC unfettered control over Nextwave. Each company had the ability to appoint one manager to oversee the operations of Nextwave. The managers then had the authority to select officers to operate Nextwave. The Operating Agreement named SHI's President Taylor as a manager and president of Nextwave, and it named UPC's President Thermos as manager and vice-president of the company.

76.    The Operating Agreement contained explicit provisions outlining an arrangement by which Seaward and UPC would divide the market for products sold by Nextwave between the two companies.   Article 7 of the Agreement, entitled "Company Business," contained the following language:

> 7.1    <u>Allocation of Product Orders</u> All orders for Products of the Company shall be allocated to each Member for production in the discretion of the Managers pursuant to the Sales Representation Agreement, subject to the following:
>
> (a) Base Line Products[1] - Seventy Percent of the production of Base Line Products shall be allocated to Seaward and thirty percent (30%) of such production shall be allocated to UPC.
>
> (b) Other Products - All production of Products other than Base Line Products shall be allocated equally to each Member, or as agreed by the Managers.
>
> 7.5    <u>Product Pricing</u> The Company shall sell the Products at such prices and on such terms as the Managers may determine in their sole and absolute discretion.

77.    Pursuant to the terms of the Operating Agreement and their pre-existing understanding, Seaward and UPC divided the market for the products in accordance with the Operating Agreement.

78.    In order to keep track of the allocation of projects between Seaward and UPC, Seaward (and later VHS/TEP) generated, *inter alia*, "Order Logs" that identified the production value of contracts awarded to UPC and Seaward (later VHS/TEP) through the course of the year.

79.    In fiscal year 2001, the Order Log generated by Seaward reflected $4,107,627.04 in total orders, with 64.68% being allocated to Seaward and 35.32% being allocated to UPC, as previously agreed.

---

[1]    "Base Line Products" are defined in Exhibit B to the Agreement as "Foam Filled Fenders" and "Surface Buoys."

80.     In fiscal year 2002, the Order Log generated by Seaward had a total cumulative order value of $15,652,774.25 (including revenues from the previous year) with adjusted allocations of 68.09% going to Seaward and 31.91% going to UPC.

81.     The Order Log for fiscal year 2002 (which contained entries through November 18, 2002) provided for "Future Orders to Balance to 70/30," and specified that $973,704.18 in orders would go to Seaward to achieve the agreed-upon 70/30 ratio.

82.     The Order Log for 2002 further stated that Nextwave sales constituted 22.98% of the total sales by the two entities as of November 18, 2002, but sales by UPC and Seaward outside of Nextwave were still considered in calculating the 70/30 split in production.

83.     Before, during, and after the period of Nextwave's existence, both UPC and Seaward systematically bid directly and indirectly on all projects as if they were independent competitors, without revealing their price-fixing, bid-rigging and market allocation scheme to their customers.

84.     Nextwave was paid hundreds of thousands of dollars in commissions on its sales by UPC and Seaward.

**VHS/TEP**

85.     In or around December 2002, Trelleborg acquired most of SHI's assets and operations (including the Seaward Foam-Filled Fenders and Buoys manufacturing business) and discontinued SHI's participation in Nextwave. However, Trelleborg continued to participate in the ongoing price-fixing, bid-rigging, and market allocation scheme with UPC through its subsidiary VHS/TEP, which took over the operations of Seaward.

86.     In fiscal year 2003, VHS/TEP generated an Order Log reflecting the same 70/30 distribution of work between VHS/TEP and UPC.  The Order Log indicated a total cumulative order value of $26,202,700.32 (including revenues

1  from previous years), with adjusted allocations of 68.27% to Seaward (later

2  VHS/TEP) and 31.73% to UPC, as previously agreed.

3       87.    The Order Log for 2003 similarly provided for "Future Orders to

4  Balance to 70/30," and specified that $1,486,071.49 in orders would be allocated to

5  Seaward to achieve the agreed-upon 70/30 ratio.

6       88.    VHS/TEP produced a similar log for "Pending Projects" in early

7  2004, which contained the same allocation of projects between UPC and

8  VHS/TEP.  Even though the projects had not yet been awarded, the log described

9  the anticipated division of those projects between the two manufacturers and the

10  estimated price for products.

11       89.    In the period 2000 through 2002, Thermos regularly communicated

12  with March and Taylor (among others) at Seaward in furtherance of the price-

13  fixing, bid-rigging, and market allocation scheme involving UPC, Seaward and

14  Nextwave.  Following Trelleborg's acquisition of SHI's operations in

15  approximately December 2002, Thermos continued to communicate thereafter with

16  Taylor (among others) at VHS/TEP in furtherance of the same unlawful scheme.

17  **WSC and Seymour Waterman**

18       90.    UPC and Seaward (subsequently VHS/TEP) typically sold their

19  products directly to customers.  However, they also sold through distributors as

20  well.

21       91.    UPC's and Seaward's primary distributor was WSC.  WSC had

22  knowledge of and participated in the price-fixing, bid-rigging, and market

23  allocation scheme for Foam-Filled Fenders and Buoys described herein.

24       92.    Following the ostensible termination of the Nextwave Operating

25  Agreement by VHS/TEP, UPC and VHS/TEP arranged numerous sales pursuant to

26  the unlawful agreement with or through WSC.

27

28

CLASS ACTION COMPLAINT                                                           19

93.    UPC and VHS/TEP implemented this new strategy, at least in part so as to maintain the same ratios of production that had previously been agreed to in, among other things, the Nextwave Operating Agreement.

94.    WSC and its owner Waterman had knowledge of the unlawful price-fixing, bid-rigging, and market allocation scheme and participated in its execution both before and after the termination of the Nextwave Operating Agreement. Correspondence was regularly exchanged between WSC management and Taylor or Thermos, which indicated that WSC and Waterman were well aware of the fact that UPC and Seaward (later VHS/TEP) were sharing confidential pricing information and acting collusively on pending projects.

95.    One example of a project where WSC participated with UPC and Seaward in the price-fixing, bid-rigging, and market allocation scheme was the Earle Naval Weapons Station Facility in Leonardo, New Jersey.  On or about July 16, 2001, WSC's manager Max Mougan requested that Thermos give WSC a quote on 20 Marine Guard Fenders for the Earle facility.  This information was communicated to Taylor by Thermos.  On September 7, 2001, Taylor sent an email to Thermos, suggesting a per unit price that they should bid on the Foam-Filled Fenders, and proposing that they give Mougan a 5% commission on the project. On or about December 11, 2001, Seaward quoted Midatlantic Construction a price of $25,350 per unit for the Foam-Filled Fenders with domestically produced hardware and $23,650 with imported hardware. A copy of the bid was later provided by Taylor to WSC.  On January 14, 2002, Midatlantic Construction requested a quote from UPC on the same project.  Thermos sent a quote to Midatlantic Construction, specifying a minimum price of $24,000 per fender.  This information was also provided to WSC.  Pursuant to the unlawful arrangement, WSC priced the Foam-Filled Fenders at $23,600 per fender and was therefore the successful bidder.

96.    Taylor sent a letter on or about January 28, 2002 to Mougan (which was copied to Thermos) reminding Mougan, "[a]s we discussed the plan is to process this order through our JV, Nextwave Marine."   The order was subsequently run through Nextwave, and was entered in the log beside Order Date January 28, 2002 with "Waterman" specified as the customer.

97.    On January 18, 2002, Mougan sent a purchase order to Thermos and Taylor, along with a copy of the agreement showing the price at which the Foam-Filled Fenders had been sold.  On a cover post-it note, he asked that WSC's net cost (*i.e.*, the price per unit WSC would receive) be filled in by "Jerry/Bob".  The number entered onto the P.O. was "$20,805 each."   In follow-up correspondence to Thermos dated January 29, 2002, Mougan noted that WSC had collected a 5% commission on the sale and that part of the sale price would also pay for hardware supplied by WSC.  Accordingly, the scheme outlined by Taylor in his September 7, 2001 email to Thermos proceeded essentially as planned, with a 5% commission and other benefits going to WSC as a payment for its participation in the scheme.

98.    When WSC purchased products from Nextwave, UPC or Seaward (later VHS/TEP) during the Foam-Filled Fenders and Buoys Class Period (defined below), such purchases were made for distribution to WSC's customers pursuant to the same scheme described above.  WSC and Waterman then profited from commissions on the sales, and WSC profited from the sale of hardware accompanying the products, as WSC was the principal supplier of hardware to both UPC and Seaward (later VHS/TEP) prior to Thermos' departure from UPC.

99.    In approximately May 2004, Douglas Farrow and his brother Kenneth Farrow visited WSC to meet with Waterman and Mougan.  In that meeting, Douglas Farrow asked about Nextwave.  Mougan responded, in Kenneth Farrow and Seymour Waterman's presence, that Nextwave was just an idea of Taylor and Thermos that had never come into operation.  In fact, WSC was one of Nextwave's primary customers.  In 2002, almost half of Nextwave's revenues came from sales

1    of products to WSC.  Waterman signed the checks made out to Nextwave by WSC

2    for the Foam-Filled Fenders and Buoys purchased during that period.

3    **Maritime International and John Deats**

4    100.   Maritime International was another distributor used by UPC and

5    Seaward (later VHS/TEP) during the Foam-Filled Fenders and Buoys Class Period.

6    101.   Maritime International and John Deats had knowledge of and

7    participated in the unlawful price-fixing, bid-rigging, and market allocation scheme

8    of UPC and Seaward (later VHS/TEP) described herein.  Maritime International

9    and John Deats bid on projects with the knowledge that UPC and Seaward (later

10   VHS/TEP) were coordinating their bids on the same projects.  Maritime

11   International and Deats coordinated their bids with UPC and Seaward on the same

12   projects.

13   102.   One example of Maritime International and Deats' knowledge and

14   participation in the price-fixing, bid-rigging, and market allocation scheme is in an

15   email dated December 12, 2003, wherein Deats wrote to Thermos expressing his

16   concerns about a Seaward bid on a project titled Dakota Bulk.  In his message, he

17   states "Seaward quoted $14,500 through a local agent (Spectra)??? What the

18   F?!???!!??? I thought that you all had talked about this job?"

19   103.   In an email dated September 30, 2003, Deats passed along

20   confidential information concerning another project, then added " [L]et me know if

21   you already know about this (or if Bob told you about it)."

22   104.   In another email dated November 14, 2002, Deats wrote: "What about

23   the hardware stuff from Bob?? Did ya'll standardize things so that we can begin

24   pricing stuff for you???"

25   105.   Plaintiffs are informed and believe that "Bob" in both of the foregoing

26   emails refers to Robert Taylor at Seaward.

27

28

**FenderCare**

106. FenderCare sells Foam-Filled Fenders on behalf of Maritime International and has agreed to and participated in the price-fixing, bid-rigging, and market allocation scheme involving Foam-Filled Fenders as well.

**MFI**

107. Thermos resigned from UPC in April 2004 after a dispute with Elizabeth Thermos concerning the ownership of UPC and alleged misuse of corporate funds by him.

108. At or about the time of his resignation from UPC, Thermos created MFI, a company which also manufactures Foam-Filled Fenders and Buoys. Thermos took equipment, trade secrets, and all of the staff from UPC to start and operate MFI.

109. As a result, MFI was fully operational only weeks after being incorporated, while UPC was crippled and unable to compete in the market for Foam-Filled Fenders and Buoys.

110. UPC ceased being a participant in the Foam-Filled Fenders and Buoys conspiracy on or about April 28, 2004 and was immediately replaced by MFI.

111. Beginning in April 2004, throughout the Foam-Filled Fenders and Buoys Class Period (defined below), MFI, Thermos and VHS/TEP continued, in cooperation with WSC, Maritime International, and others, the same price-fixing, bid-rigging and market allocation conspiracy.

**Fentek and Thomas Crawaack**

112. During the Foam-Filled Fenders and Buoys Class Period (defined below) and Marine Fenders Class Period (defined below), Fentek sold Foam-Filled Fenders and Buoys as well as Marine Fenders.

113. Fentek had knowledge of VHS/TEP's wrongful conduct described herein and authorized and directed such wrongful conduct through, among others, its President, Tomas Crawaak, who also sits on VHS/TEP's board.

114.   Crawaack actively participated in directing and authorizing the price-fixing, bid-rigging, and market allocation scheme described herein involving Seaward (later VHS/TEP) and UPC and MFI through, among others, meetings, conversations and/or other communications with Thermos and Taylor throughout the Foam-Filled Fenders and Buoys Class Period.

115.   In 2004 and 2005, Douglas Farrow spoke with Crawaack regarding UPC on multiple occasions.  In those conversations, Crawaack acknowledged that VHS/TEP and UPC had coordinated their bidding in the past (*i.e.*, prior to the time that Thermos left UPC), and he explicitly expressed a desire for UPC and MFI (Thermos' current company) to reunite, and for UPC, MFI, and VHS/TEP to continue the unlawful price fixing, bid-rigging, and market allocation conspiracy. Crawaak indicated that his motivation for the continuing arrangement was to increase profitability for the participants in the scheme.

**Larry Lizotte**

116.   Larry Lizotte was employed at UPC's office in Bellflower, California during the Foam-Filled Fenders and Buoys Class Period as a manager for the company.  Lizotte resigned at or about the time that Thermos left UPC in April 2004, after which he joined Thermos at MFI.

117.   Lizotte was aware of and participated in the ongoing price-fixing, bid-rigging and market allocation scheme between UPC and Seaward (later VHS/TEP) from approximately 2000 through his resignation in April 2004.  Lizotte continued to assist in the price-fixing, bid-rigging, and market allocation scheme after leaving UPC and joining MFI through at least August 2005.

118.   Lizotte assisted in the implementation of the scheme by, among other things, preparing collusive bids on projects, communicating with Seaward (later VHS/TEP) regarding pending projects, and regularly tracking the projects that were to be divided between the two companies.

119.   For example, on or about August 28, 2001, Seaward faxed to UPC a copy of Seaward's bid on a United States Navy project at Pier 12 in Norfolk, Virginia.  The price set forth in Seaward's quote was $595,400 for 26 Foam-Filled Fenders.

120.   Seaward also sent, via the same fax to UPC, a list of plan-holders on the project (*i.e.*, the contractors who might perform the work).  Some of the names on the list were checked, some were stricken, and others had "NO" written beside them.

121.   Lizotte prepared a quote on behalf of UPC for the project. The quote was in the amount of $625,950 for the same size Foam-Filled Fenders referenced in the Seaward quote.  The UPC quote was then sent by Lizotte to the plan-holder names checked on the list provided by Seaward.  There was no substantive cost estimating information by UPC pertaining to the project.  Consistent with their scheme, the project was subsequently awarded to Seaward.

122.   The logs reflecting the division of projects between UPC and Seaward (later VHS/TEP) were kept on Lizotte's computer, among others. The Pier 12 project is reflected in the log as awarded to Seaward with the customer name "Marine Cont. - Pier 12 Norfolk" and an Order Date of October 19, 2001.

**ProMar, LLC**

123.   Taylor created a company named ProMar, LLC in or around 1997, which was engaged in the Foam-Filled Fenders and Buoys business.

124.   Taylor operated ProMar in the same manner that he did at Seaward. That is, he unlawfully shared confidential pricing information and coordinated bids with competitors in advance of contracts being awarded by customers and without the knowledge of those customers.

125.   In 1998, ProMar was teaming up with Seaward on bids. On or about December 23, 1998, Taylor wrote to Thermos on behalf of ProMar, expressing his desire to work together.  He also discussed ProMar's pending bid at the time on a

1  project in Singapore and separately faxed Thermos a copy of a December 23, 1998

2  letter by ProMar to Bridgestone, which discussed ProMar's possible role in the

3  project.

4      126.   On January 11, 1999, Andrew Hill wrote on behalf of ProMar to

5  Thermos. In the letter, Hill stated that, based on his conversations with March and

6  the owners of ProMar, "a consolidation of the industry seems to be important to all

7  of us." He then detailed possible arrangements for merging all of the competitors

8  into one entity.

9      127.   On January 15, 1999, Taylor wrote to Thermos, again under ProMar

10 letterhead, to discuss arrangements for March, Taylor and Thermos to meet in Los

11 Angeles. The letter expressed Taylor's desire "to make this work" and his belief

12 that it "can really be good for all of us."

13     128.   In 1999, SHI acquired ProMar. UPC and SHI thereafter entered into

14 the price-fixing, bid-rigging, and market-allocation scheme.

15     129.   In 2002, certain of SHI's assets and operations were purchased by

16 VHS/TEP, including the Seaward Foam-Filled Fenders and Buoys manufacturing

17 operation.

18     130.   During the Foam-Filled Fenders and Buoys Class Period (defined

19 below) and Marine Fenders Class Period (defined below), ProMar filed collusive

20 bids on numerous Foam-Filled Fenders and Buoys projects as part of the ongoing

21 unlawful price-fixing bid-rigging, and market allocation scheme involving, among

22 others, its principal Taylor.

23     **Donald Murray**

24     131.   Donald Murray was CFO of Seaward and then moved into a similar

25 position at VHS/TEP after the acquisition of Seaward's operations by Trelleborg.

26     132.   Murray was involved in the unlawful price-fixing, bid-rigging, and

27 market allocation scheme from January 2002 (and likely earlier) through at least

28 early 2004 (and likely later).

133.  Murray participated in preparing the Order Logs described above that were used by Seaward (later VHS/TEP) and UPC to coordinate their conspiracy. On or about January 7, 2002, Murray sent a fax to Thermos' accountant, with the Nextwave Order Log as of that date attached.  On the cover sheet, Murray referred to the log as the "Order Log I keep."

134.  The Order Logs used by UPC and Seaward (later VHS/TEP) were produced on Excel spreadsheets.  Murray's name appears as the author in the properties section of at least one of the logs/spreadsheets.

135.  Murray also participated in the preparation of the logs with knowledge that they were to be used in implementing the unlawful price-fixing, bid-rigging, and market allocation scheme described herein.

136.  Murray also prepared financial statements for Nextwave and participated in direct communications with Thermos and his accountant Neil Xavier regarding Nextwave's financials.  For example, on or about January 22, 2002, Murray sent a fax to Taylor, with the Nextwave order log for 2001 attached. In his message to Taylor, Murray wrote that he had determined the amount of "commissions" to be paid to Nextwave by UPC and Seaward, based on the total sales by the two entities.  He wrote this message while aware of the fact that no orders had even been placed with Nextwave as of that date, *i.e.*, that it was simply a vehicle for allocating sales between the two entities.  Murray's knowledge on this point is reflected in another fax message he sent on January 7, 2002 to Thermos' accountant Xavier, where Murray wrote the following: "In January there will be actual orders processed through Nextwave.  Through December, everything was on a commission basis."

137.  Murray thus participated in and furthered the conspiracy in which projects were allocated between UPC and Seaward, and certain of the profits were directed to Nextwave and then on to the principals in the conspiracy. The financial

1    data included journal detail reports, which reflected large payments by Nextwave

2    directly to Thermos.

3        138.   As late as February 21, 2003, Murray was also providing similar

4    financial information regarding Nextwave's operations directly to Thermos.

5        **Peter Nilsson**

6        139.   Peter Nilsson is the current president of Trelleborg.  Nilsson was

7    President of TES between approximately June 1, 2003 and October 1, 2005.  Prior

8    to June 1, 2003, Nilsson was head of VHS/TEP.  During the Foam-Filled Fenders

9    and Buoys Class Period (defined below), Nilsson also sat on VHS/TEP's Board of

10    Directors.

11        140.   During the Foam-Filled Fenders and Buoys Class Period (defined

12    below), Nilsson authorized, directed and approved the price-fixing, bid-rigging,

13    and market allocation scheme involving Foam-Filled Fenders and Buoys.  Nilsson

14    directed, encouraged and approved such conduct via multiple communications

15    between 2002 and 2004 with other Trelleborg personnel, including, but not limited

16    to Crawaack, who sought and received Nilsson's approval for Trelleborg to

17    participate in the scheme.

18        141.    Nilsson engaged in communications regarding the price-fixing, bid-

19    rigging, and market allocation scheme, directly or indirectly, with various

20    Defendants who ultimately reported to him at Trelleborg, including Defendants

21    that have pleaded guilty to their participation in conspiracies to fix prices of Foam-

22    Filled Fenders and Buoys and Marine Pilings.  Nilsson's direction, authorization

23    and approval of this conduct continued throughout the Foam-Filled Fenders and

24    Buoys Class Period, including the period after he became president of Trelleborg.

25        **Criminal Pleadings to Date**

26        142.   A number of the Foam-Filled Fenders and Buoys Defendants have

27    pleaded guilty to participating in a conspiracy to allocate customers and rig bids for

28

1  Foam-Filled Fenders and Buoys in the United States in connection with a criminal

2  investigation launched by the DOJ.

3      143.  On or about June 9, 2006, Thermos entered into a plea agreement with

4  the DOJ pursuant to which he agreed to plead guilty to "a single count criminal

5  information charging him with participating in a conspiracy to suppress and

6  eliminate competition by allocating customers and rigging bids for contracts of

7  foam-filled marine fenders and buoys in the United States and elsewhere from in or

8  about June 2000, continuing until in or about August 2005, in violation of the

9  Sherman Antitrust Act, 15 U.S.C. § 1."   The plea agreement provided, upon the

10  satisfaction of certain conditions, for the DOJ to recommend that Thermos pay a

11  $50,000 criminal fine and serve a sentence of eight months, including four months

12  in jail and four months of supervised release.  The plea agreement was filed on

13  September 15, 2006.  Thermos was subsequently sentenced to jail time which he

14  has now served.

15      144.  On or about February 14, 2007,  Taylor entered into a plea agreement

16  with the DOJ pursuant to which Taylor agreed to "waive indictment and plead

17  guilty to a three count criminal information charging the defendant with: (1)

18  participating in a conspiracy to suppress and eliminate competition by allocating

19  customers and rigging bids for contracts of foam-filled marine fenders and buoys

20  in the United States and elsewhere from at least as early as June 2000, continuing

21  until as late as August 2005, in violation of the Sherman Antitrust Act. 15 U.S.C. §

22  1; (2) participating in a conspiracy to suppress and eliminate competition by

23  allocating customers and rigging bids for contracts of plastic marine pilings in the

24  United States and elsewhere from at least as early as December 2000 until as late

25  as May 2003, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (3)

26  participating in a conspiracy to corruptly give, offer or agree to give money with

27  the intent to influence an agent of the New York City government in connection

28

1   with a series of transactions from at least as early as January 2000 until at least

2   December 2002, in violation of 18 U.S.C. §§ 371 and 666."

3          145.   The plea agreement provided, upon the satisfaction of certain

4   conditions, for the DOJ to recommend that "the Court impose a sentence requiring

5   the defendant to pay to the United States a criminal fine of $100,000 and to serve a

6   jail term of thirty (30) months of incarceration."   The plea was filed on May 10,

7   2007 in the United States District Court for the Eastern District of Virginia.  Taylor

8   was subsequently sentenced to serve jail time for his offense.

9          146.   On or about June 6, 2007, Murray entered into a plea agreement with

10   the DOJ, pursuant to which he pleaded guilty to, *inter alia*, the following charges

11   in the criminal information filed against him on the same date: "Beginning at least

12   as early as December 2002 and continuing until as late as January 2004, the exact

13   dates being unknown to the United States, the defendant participated in an ongoing

14   combination and conspiracy to suppress and eliminate competition by allocating

15   customers and rigging bids for contracts of foam-filled marine fenders and buoys

16   in the United States and elsewhere."  Murray was subsequently sentenced to serve

17   18 months in prison, fined $75,000, and required to pay $224,269.89 in restitution.

18          147.   On or about June 15, 2009, Virginia Harbor Services entered into a

19   plea agreement with the DOJ, pursuant to which it pleaded guilty to:  (i)

20   participating in a conspiracy between December 2002 and August 2005 to allocate

21   customers and rig bids for contracts of Foam-Filled Fenders and Buoys sold in the

22   United States and elsewhere; and (ii) participating in a conspiracy between

23   December 2002 and May 2003 to allocate customers and rig bids for contracts of

24   Marine Pilings.  Virginia Harbor Services was subsequently fined $7,500,000.

25          148.   On June 30, 2009, March entered into a plea agreement with the DOJ,

26   pursuant to which he pleaded guilty to, *inter alia*, the following charges in the

27   criminal information filed against him on the same date: "Beginning in or about

28   June 2001 and continuing until in or about December 2002, the exact dates being

CLASS ACTION COMPLAINT                                                              30

1   unknown to the United States, the defendant participated in an ongoing

2   combination and conspiracy to suppress and eliminate competition by allocating

3   customers and rigging bids for contracts of foam-filled marine fenders and buoys

4   in the United States and elsewhere."   March was subsequently sentenced to 18

5   months in prison and fined $100,000.

6               **THE MARINE PILINGS CONSPIRACY**

7        149.   Beginning at least as early as January 2000, the Marine Pilings

8   Defendants and their co-conspirators participated in a continuing conspiracy in

9   unreasonable restraint of trade to artificially raise, fix, maintain or stabilize prices,

10  rig bids and allocate the market and customers in the United States for Marine

11  Pilings in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

12       150.   Seaward (later VHS/TEP) engaged in the same practice and pattern of

13  unlawfully fixing prices, rigging bids and allocating the market for Marine Pilings

14  with PPI as it did with UPC.  The Marine Pilings conspiracy was intertwined with

15  the Foam-Filled Fenders and Buoys conspiracy, as many of the same Defendants

16  were involved.

17       151.   Thermos has had a close relationship with the owners and/or

18  management of PPI from at least the late 1990s.  UPC sold chemicals to PPI.

19  Moreover, even though UPC was not involved in the Marine Pilings business,

20  Thermos included advertising for PPI's Marine Pilings on UPC's website until his

21  departure from UPC, and Barmakian (PPI's President) frequently met with

22  Thermos at UPC to discuss the operations of the respective businesses.

23       152.   During the Marine Pilings Class Period (defined below), Thermos and

24  UPC also had possession of Seaward's confidential pricing information on Marine

25  Pilings.

26       153.   In approximately 2000, Thermos, Seaward, and PPI developed a plan

27  for the coordinated sales of PPI and Seaward's Marine Pilings through a so-called

28  "joint venture" managed by Taylor, Barmakian and Thermos.  Meetings were held

1   among UPC, PPI and Seaward in California around October 2000 regarding the

2   scheme, and documents were drafted describing how the operation would work.

3   As with Nextwave, the scheme provided that sales by the joint venture entity

4   would be allocated according to "target production ratios" for Seaward (later

5   VHS/TEP) and PPI.  Moreover, if Seaward (later VHS/TEP) or PPI sold directly to

6   customers, the plan provided for the same target ratios to be observed.  March, the

7   principal of Seaward, was aware of and approved the plan.

8          154.   As a result of the plan, since approximately 2000 through at least

9   2006, PPI and Seaward (later VHS/TEP) engaged in a practice of price-fixing, bid-

10  rigging, and market allocation of Marine Pilings in the United States and have

11  systematically charged supra-competitive prices to customers.

12         **Criminal Pleadings to Date**

13         155.   A number of Defendants, including Virginia Harbor Services/TEP and

14  Taylor (discussed above), have pleaded guilty to participating in a conspiracy to

15  allocate customers and rig bids for Marine Pilings sold in the United States in

16  connection with a criminal investigation launched by the DOJ.

17         156.   On September 24, 2007, VHS/TEP's CFO William Alan Potts entered

18  into a plea agreement pursuant to which he agreed to plead guilty to a single count

19  criminal information charging him with participating in a conspiracy to suppress

20  and eliminate competition by allocating customers and rigging bids for contracts of

21  Marine Pilings sold in the United States and elsewhere from as early as December

22  2002 and continuing until as late as May 2003 in violation of the Sherman

23  Antitrust Act, 15 U.S.C., § 1.  Potts was sentenced in June 2008 to pay $60,000

24  and serve a sentence of six months in jail.

25         157.   On November 17, 2008, Andrew Barmakian entered into a plea

26  agreement with the United States pursuant to which Barmakian agreed to plead

27  guilty to a single count criminal information charging him with participating in a

28  conspiracy to suppress and eliminate competition by allocating customers and

1  rigging bids for contracts of Marine Pilings from as early as December 2000 and

2  continuing until as late as May 2003 in violation of the Sherman Antitrust Act, 15

3  U.S.C., § 1.  Under the plea agreement, which is subject to court approval,

4  Barmakian has agreed to serve a sentence and pay a criminal fine to be determined

5  by the court.

6                     **THE MARINE FENDERS CONSPIRACY**

7        158.  Beginning at least as early as January 2000, the Marine Fenders

8  Defendants and their co-conspirators participated in a continuing conspiracy in

9  unreasonable restraint of trade to fix prices, rig bids and allocate the market for

10  Marine Fenders in the United States in violation of Section 1 of the Sherman Act,

11  15 U.S.C. § 1.

12        159.  Most pneumatic fenders sold in the United States between at least

13  2002 and the present have been manufactured by Yokohama, which has had a

14  worldwide share of the pneumatic fender market ranging from approximately 60-

15  80% in recent years.  Bridgestone and Sumitomo also manufacture pneumatic

16  fenders which are sold in the Untied States.

17        160.  Since approximately 2002, Fentek and Trelleborg have been notably

18  absent from the Marine Fenders market in the United States, despite the fact that

19  Fentek sells pneumatic fenders, and Trelleborg and Fentek have had offices in the

20  United States that offer Marine Fenders.  Upon information and belief, Fentek has

21  not bid on pneumatic fenders projects in the United States that it was otherwise

22  qualified to bid on.

23        161.  By contrast, in Europe, Trelleborg/Fentek has been a market leader in

24  the sale of Marine Fenders in recent years, and Yokohama has not competed with

25  them in Europe for the sale of Marine Fenders.  The reason for the lack of

26  competition in the foregoing markets is an unlawful and anticompetitive agreement

27  between, among others, Yokohama and Trelleborg/Fentek to divide the worldwide

28

1  market for Marine Fenders, so that both companies can reduce competition by not

2  competing with each other and thereby charge higher prices for those products.

3      162.   In 2003, UPC and ProMar both submitted bids in response to a

4  request for bids by the Navy for pneumatic and hydro-pneumatic fenders. At the

5  time that UPC and ProMar made their bids, Taylor and UPC were engaged in the

6  price-fixing, bid-rigging, and market allocation scheme for Foam-Filled Fenders

7  and Buoys. Both offered the same type of Marine Fenders with their bids.

8  Notably, however, despite the fact that Taylor was president of the Trelleborg

9  subsidiary VHS/TEP at the time that ProMar submitted its bid on the above

10  project, ProMar did not propose to provide pneumatic fenders supplied by Fentek.

11  Instead, both ProMar and UPC proposed to provide Marine Fenders made by HS

12  R&A, Ltd., a Korean firm.

13      163.   The reason ProMar offered pneumatic fenders made by HS R&A, Ltd.

14  in 2003 was due to a pre-existing agreement between Trelleborg and Yokohama

15  which provided that Trelleborg and Fentek would not compete with Yokohama in

16  the pneumatic fenders market in the United States.

17      164.   In or around October 2004, Farrow spoke with Kota Kusaba, a

18  representative of Yokohama. In that conversation, Kusaba acknowledged that

19  Yokohama had a working relationship with Taylor and was familiar with ProMar.

20      165.   FenderCare Marine Solutions has had exclusive rights to represent

21  Yokohama in the United States during the Marine Fenders Class Period. During

22  the Marine Fenders Class Period, FenderCare has handled about 60% of

23  Yokohama's manufacturing output. Plaintiffs are informed and believe that

24  Yokohama entered into its price-fixing, bid-rigging and market allocation scheme

25  with the full knowledge and complicity of FenderCare.

26      166.   During the Marine Fenders Class Period, Bridgestone also

27  manufactured pneumatic fenders. Bridgestone participated in the price-fixing, bid-

28  rigging, and market allocation scheme described above with regard to Marine

1  Fenders, including pneumatic fenders.  Taylor was in communication with
2  representatives of Bridgestone regarding Marine Fenders projects starting as early
3  as approximately 1998 and continued such communications thereafter as well.

4      167.   During the Marine Fenders Class Period, Sumitomo manufactured
5  Marine Fenders, including fixed and pneumatic fenders.  Sumitomo participated in
6  the price-fixing, bid-rigging, and market allocation scheme described above with
7  regard to Marine Fenders.  Relevant Marine Fenders marketed by Sumitomo
8  include, but are not limited to, pneumatic, F-type, PB-Type, hollow cylindrical, D-
9  type, circular type, Pi-type, Ultra Pi-type, V-type, Lambda-type, beta-type, fishery-
10  type, special-type, scaffold-type., and corner protectors.

11     168.   As a result of their unlawful agreement, the prices charged to Plaintiff
12  OSG Lightering  and the Marine Fenders Class for Marine Fenders made by
13  Yokohama, Bridgestone and Sumitomo were inflated.

14              **CRIMINAL PLEADINGS IN RELATED MARINE PRODUCTS**
                                    **CONSPIRACY**
15
16     169.   On or around December 2006, Defendant Yokohama struck a deal
17  with the DOJ under the DOJ's corporate leniency program in exchange for
18  amnesty, admitting its participation in a conspiracy to fix prices, rig bids and
19  allocate markets for marine hose and ancillary products in the United States.

20     170.   On or about April 20, 2009, Trelleborg Industrie S.A.S., a subsidiary
21  of Defendant Trelleborg, pleaded guilty to fixing prices, rigging bids and
22  allocating markets for marine hose and ancillary products in the United States.
23  Pursuant to its plea agreement, Trelleborg Industrie S.A.S. was fined $3.5 million.

24     171.   In addition, Trelleborg Industrie S.A.S. and Defendants Yokohama
25  and Bridgestone recently agreed to settle a class action lawsuit for $1,874,000,
26  $1,950,000 and $8,500,000, respectively, which suit alleged their participation in a
27  scheme to fix prices, rig bids and allocate markets for marine hose.

28

## ALLEGATIONS OF ANTITRUST
## INJURY TO PLAINTIFFS AND THE CLASS

172. Defendants' unlawful conspiracies had the following anticompetitive effects, among others:

(a)    prices charged to Plaintiffs and each of the Classes for Foam-Filled Fenders and Buoys, Marine Pilings and Marine Fenders in the United States have been fixed, raised, maintained, or stabilized at higher, artificially-derived, non-competitive levels;

(b)    Plaintiffs and each of the Classes have been deprived of the benefits of free, open and unrestricted competition in the sale of Foam-Filled Fenders and Buoys, Marine Pilings and Marine Fenders in the United States; and

(c)    competition in establishing prices for Foam-Filled Fenders and Buoys, Marine Pilings and Marine Fenders in the United States has been unlawfully restrained, suppressed and eliminated.

173. By reason of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiffs and each of the Classes have sustained injury to their business or property. The injury sustained by Plaintiffs and each of the Classes is the payment of supra-competitive prices for Foam-Filled Fenders and Buoys, Marine Pilings and Marine Fenders. This is an injury of the type that the antitrust laws were meant to punish, prevent, and redress.

## CLASS ACTION ALLEGATIONS

174. Plaintiffs bring this action as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated. The " Foam-Filled Fenders and Buoys Class" is defined as:

> All persons or entities that purchased Foam-Filled Fenders and/or Buoys in the United States directly from one or more of the Foam-Filled Fenders and Buoys Defendants from June 1, 2000 to August 31, 2005 (the "Foam-Filled Fenders and Buoys Class Period"). Excluded from the Foam-Filled Fenders and Buoys Class are the Foam-Filled Fenders and Buoys Defendants, any

parents, subsidiaries or affiliates of the Foam-Filled Fenders and Buoys Defendants (whether or not named as a Defendant in this Complaint), any of the Foam-Filled Fenders and Buoys Defendants' co-conspirators and federal government entities.

The "Marine Pilings Class" is defined as:

All persons or entities that purchased Marine Pilings in the United States directly from one or more of the Marine Pilings Defendants from January 1, 2000 to December 31, 2006 (the "Marine Pilings Class Period"). Excluded from the Marine Pilings Class are the Marine Pilings Defendants, any parents, subsidiaries or affiliates of the Marine Pilings Defendants (whether or not named as a Defendant in this Complaint), any of the Marine Pilings Defendants' co-conspirators and federal government entities.

The "Marine Fenders Class" is defined as:

All persons or entities that purchased Marine Fenders in the United States directly from one or more of the Marine Fenders Defendants from January 1, 2000 to December 31, 2006 (the "Marine Fenders Class Period"). Excluded from the Marine Fenders Class are the Marine Fenders Defendants, any parents, subsidiaries or affiliates of the Marine Fenders Defendants (whether or not named as a Defendant in this Complaint), any of the Marine Fenders Defendants' co-conspirators and federal government entities.

175. Each Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are numerous members of each Class and that their identities can be learned from Defendants' and their co-conspirators' books and records.

176. Plaintiff Port of Galveston's claims are typical of the claims of the Foam-Filled Fenders and Buoys Class. Plaintiff Port of Galveston and members of the Foam-Filled Fenders and Buoys Class purchased Foam-Filled Fenders and Buoys during the Foam-Filled Fenders and Buoys Class Period at artificially maintained, non-competitive prices, established by the unlawful actions of the Foam-Filled Fenders and Buoys Defendants and their co-conspirators. Plaintiff Port of Galveston and members of the Foam-Filled Fenders and Buoys Class have

1 | sustained damage in that they paid inflated prices for Foam-Filled Fenders and
2 | Buoys during the Foam-Filled Fenders and Buoys Class Period due to the Foam-
3 | Filled Fenders and Buoys Defendants' conduct in violation of federal law as set
4 | forth herein.

5 |     177. Plaintiff Port of New Orleans' claims are typical of the claims of the
6 | Marine Pilings Class. Plaintiff Port of New Orleans and members of the Marine
7 | Pilings Class purchased Marine Pilings during the Marine Pilings Class Period at
8 | artificially maintained, non-competitive prices, established by the unlawful actions
9 | of the Marine Pilings Defendants and their co-conspirators. Plaintiff Port of New
10 | Orleans and members of the Marine Pilings Class have sustained damage in that
11 | they paid inflated prices for Marine Pilings during the Marine Pilings Class Period
12 | due to the Marine Pilings Defendants conduct in violation of federal law as set
13 | forth herein.

14 |     178. Plaintiff OSG Lightering's claims are typical of the claims of the
15 | Marine Fenders Class. Plaintiff OSG Lightering and members of the Marine
16 | Fenders Class purchased Marine Fenders during the Marine Fenders Class Period
17 | at artificially maintained, non-competitive prices, established by the unlawful
18 | actions of the Marine Fenders Defendants and their co-conspirators. Plaintiff OSG
19 | Lightering and members of the Marine Fenders Class have sustained damage in
20 | that they paid inflated prices for Marine Fenders during the Marine Fenders Class
21 | Period due to the Marine Fenders Defendants' conduct in violation of federal law
22 | as set forth herein.

23 |     179. Plaintiffs will fairly and adequately protect the interests of the
24 | members of each Class and have retained counsel competent and experienced in
25 | class action and antitrust litigation.

26 |     180. Common questions of law and fact exist as to all members of each
27 | Class which predominate over any questions affecting solely individual members
28 |

1  of each of the Classes.  Among the questions of law and fact common to each of

2  the Classes are:

3         (a)     Whether Defendants conspired to raise, fix, maintain or

4  stabilize the price of, rig bids and allocate the market for Foam-Filled Fenders and

5  Buoys, Marine Pilings, and Marine Fenders in the United States;

6         (b)     Whether Defendants undertook actions to conceal their

7  unlawful conspiracy; and

8         (c)     Whether Defendants' conduct violated the relevant U.S. federal

9  antitrust laws and caused injury to the business and property of Plaintiffs and the

10  members of each Class and, if so, the proper measure of damages.

11       181.   A class action is superior to other available methods for the fair and

12  efficient adjudication of this controversy because joinder of the members of each

13  of the classes is impracticable.  The prosecution of separate actions by individual

14  members of each Class would impose heavy burdens upon the courts and

15  Defendants, and would create a risk of inconsistent or varying adjudications of the

16  questions of law and fact common to each Class.  A class action, on the other hand,

17  would achieve substantial economies of time, effort and expense, and would assure

18  uniformity of decision as to persons similarly situated without sacrificing

19  procedural fairness or bringing about other undesirable results.

20       182.   Each Class has a high degree of cohesion, and prosecution of the

21  action through representatives would be unobjectionable.  The amounts at stake for

22  Class members of each Class, while substantial in the aggregate, are not great

23  enough individually to enable them to maintain separate suits against Defendants.

24  Plaintiffs do not anticipate any difficulty in the management of this action as a

25  class action.

26                         **FRAUDULENT CONCEALMENT**

27       183.   Defendants fraudulently concealed their participation in the

28  conspiracies alleged by, among other things, engaging in secret meetings and

communications in furtherance of the conspiracies, and by holding themselves out as competitors to the public, to Plaintiffs, and to the members of each Class. Because of such fraudulent concealment, and the fact that a price-fixing conspiracy is inherently self-concealing, Plaintiffs and the members of the Classes could not have discovered the existence of these conspiracies any earlier than public disclosures thereof.

184.   Throughout the Class Periods, Defendants and their co-conspirators have affirmatively and fraudulently concealed their unlawful conduct from Plaintiffs and the members of the Classes to prevent Plaintiffs and the members of the Classes from suing them for the anticompetitive and unlawful conduct alleged in this Complaint.

185.   Defendants wrongfully concealed their conspiracies by various means and methods that precluded detection, including but not limited to: secret meetings; and surreptitious communications among Defendants via telephone, in-person meetings in order to conceal the existence and nature of their competitor pricing discussions from non-conspirators.

186.   Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracies.

187.   Plaintiffs and members of the Classes reasonably relied on the Defendants' materially false or misleading bids and Plaintiffs and members of the Classes were lulled into believing that Defendants' bids were the result of free and open competition, rather than the product of Defendants' collusive activities.

188.   Because the alleged conspiracies were both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracies, did not know that they were paying artificially high supra-competitive prices for Foam-Filled Fenders and Buoys, Marine Pilings and Marine Fenders, and had no

1  knowledge of any facts or information that would have caused a reasonably

2  diligent person to investigate whether the conspiracies existed until: (i) April 6,

3  2006 for Foam Filled Fenders and Buoys, the date that UPC filed an action against

4  VHS/TEP, UPC and MFI, among others, alleging that they had participated in a

5  price-fixing, bid-rigging and market allocation conspiracy involving Foam-Filled

6  Fenders and Buoys; (ii) February 21, 2007 for Marine Pilings, the date the DOJ

7  filed its criminal information against Taylor; and (iii) February 25, 2010 for

8  Marine Fenders, the date that the DOJ announced the settlements in the qui tam

9  action (together, the "Notice Dates").

10      189.   At all relevant times and in all relevant respects, Plaintiffs and other

11  members of the Classes exercised reasonable diligence.

12      190.   None of the facts or information available to Plaintiffs and members

13  of the Classes prior to the Notice Dates, if investigated with reasonable diligence,

14  could or would have led to the discovery of the conspiracies alleged in this

15  Complaint.

16      191.   As a result of Defendants' conduct and concealment of their

17  conspiracies, Plaintiffs and members of the Classes were prevented from learning

18  of the facts needed to commence suit against Defendants for the anticompetitive

19  conduct alleged in this Complaint until the Notice Dates.

20      192.   Because of Defendants' active steps, including fraudulent

21  concealment of their conspiracies, to prevent Plaintiffs and members of the Classes

22  from suing them for the anticompetitive activities alleged in this Complaint,

23  Defendants are equitably estopped from asserting that any otherwise applicable

24  limitations period has run.

25      193.   The running of any applicable statute of limitations has been equitably

26  tolled as to any claims of Plaintiffs and members of the Classes as a result of the

27  anticompetitive conduct alleged in this Complaint.

28

CLASS ACTION COMPLAINT                                              41

1

**FIRST CLAIM FOR RELIEF**

2

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT INVOLVING
FOAM-FILLED FENDERS AND BUOYS**

3

4        194.   Plaintiff Port of Galveston incorporates by reference the preceding

5   allegations.

6        195.   The Foam-Filled Fenders and Buoys Defendants and their unnamed

7   co-conspirators entered into and engaged in a conspiracy in unreasonable restraint

8   of trade in violation of Section 1 of the Sherman Act and Sections 4 of the Clayton

9   Act.

10       196.   The conspiracy consisted of a continuing agreement, understanding or

11   concerted action between and among the Foam-Filled Fenders and Buoys

12   Defendants and their co-conspirators in furtherance of which the Foam-Filled

13   Fenders and Buoys Defendants fixed prices, rigged bids and allocated the market

14   and customers in the United States for Foam-Filled Fenders and Buoys.  The

15   Foam-Filled Fenders and Buoys Defendants' conspiracy is a *per se* violation of the

16   federal antitrust laws and is, in any event, an unreasonable and unlawful restraint

17   of trade.

18       197.   The Foam-Filled Fenders and Buoys Defendants' conspiracy, and

19   resulting impact on the market in the United States for Foam-Filled Fenders and

20   Buoys occurred in or affected interstate and international commerce.

21       198.   As a proximate result of the Foam-Filled Fenders and Buoys

22   Defendants' unlawful conduct, Plaintiff Port of Galveston and the Foam-Filled

23   Fenders and Buoys Class have suffered injury in that they have paid supra-

24   competitive prices for Foam-Filled Fenders and Buoys in the United States.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SECOND CLAIM FOR RELIEF

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT INVOLVING MARINE PILINGS

199.   Plaintiff Port of New Orleans incorporates by reference the preceding allegations.

200.   The Marine Pilings Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Sections 4 of the Clayton Act.

201.   The conspiracy consisted of a continuing agreement, understanding or concerted action between and among the Marine Pilings Defendants and their co-conspirators in furtherance of which the Marine Pilings Defendants fixed prices, rigged bids and allocated the market and customers in the United States for Marine Pilings. The Marine Pilings  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

202.   The Marine Pilings Defendants' conspiracy, and resulting impact on the market in the United States for Marine Pilings occurred in or affected interstate and international commerce.

203.   As a proximate result of the Marine Pilings Defendants' unlawful conduct, Port of New Orleans and the Marine Pilings Class have suffered injury in that they have paid supra-competitive prices for Marine Pilings in the United States.

1

**THIRD CLAIM FOR RELIEF**

2

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT INVOLVING**
3
**MARINE FENDERS**

4
    204.   Plaintiff OSG Lightering incorporates by reference the preceding
5
allegations.

6
    205.   The Marine Fenders Defendants and their unnamed co-conspirators
7
entered into and engaged in a conspiracy in unreasonable restraint of trade in
8
violation of Section 1 of the Sherman Act and Sections 4 of the Clayton Act.

9
    206.   The conspiracy consisted of a continuing agreement, understanding or
10
concerted action between and among the Marine Fenders Defendants and their co-
11
conspirators in furtherance of which the Marine Fenders Defendants fixed prices,
12
rigged bids and allocated the market and customers in the United States for Marine
13
Fenders.  The Marine Fenders  Defendants' conspiracy is a *per se* violation of the
14
federal antitrust laws and is, in any event, an unreasonable and unlawful restraint
15
of trade.

16
    207.   The Marine Fenders Defendants' conspiracy, and resulting impact on
17
the market in the United States for Marine Fenders occurred in or affected
18
interstate and international commerce.

19
    208.   As a proximate result of the Marine Fenders Defendants' unlawful
20
conduct, OSG Lightering and the Marine Fenders Class have suffered injury in that
21
they have paid supra-competitive prices for Marine Fenders in the United States.

22
**RELIEF SOUGHT**

23
    Accordingly, Plaintiffs demand relief as follows:

24
    A.    That the Court determine that this action may be maintained as a class
25
action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure,
26
that Plaintiff Port of Galveston be appointed as class representative for the Foam-
27
Filled Fenders and Buoys Class; that Plaintiff Port of New Orleans be appointed as
28
class representative for the Marine Pilings Class, that Plaintiff OSG Lightering be

1 | appointed as class representative for the Marine Fenders Class and that Plaintiffs'
2 | counsel be appointed as counsel for the Classes;

3 |     B.    That the unlawful conspiracies alleged be adjudged and decreed to be
4 | an unreasonable restraint of trade or commerce, in violation of Section 1 of the
5 | Sherman Act;

6 |     C.    That Defendants, their subsidiaries, affiliates, successors, transferees,
7 | assignees and the respective officers, directors, partners, agents, and employees
8 | and all other persons acting or claiming to act on their behalf, be permanently
9 | enjoined and restrained from continuing and maintaining the conspiracies alleged
10 | in this Complaint

11 |     D.    That Plaintiffs and the Classes recover the damages determined to
12 | have been sustained as to each of them, trebled as provided by law, and that
13 | judgment be entered against Defendants, jointly and severally, on behalf of
14 | Plaintiffs and each and every member of the Classes;

15 |     E.    That Plaintiffs and the Classes recover their costs of the suit, including
16 | attorneys' fees, as provided by law; and

17 |     F.    That the Court direct such further relief it may deem just and proper.

18 | **DEMAND FOR JURY TRIAL**

19 | Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs
20 | demand a jury trial as to all issues triable by a jury.

21 | Dated: March 30, 2010               Respectfully submitted,

22

23

24 | Lionel Z. Glancy (Bar No. #134180)
25 | Michael Goldberg (Bar No. #188669)
   | **GLANCY BINKOW & GOLDBERG LLP**
26 | 1801 Ave. of the Stars , Suite 311
   | Los Angeles, CA 90067
27 | Telephone: (310) 201-9150
   | Facsimile: (310) 201-9160
28 | info@glancylaw.com

Bernard Persky
Hollis L. Salzman
Eric J. Belfi
Gregory Asciolla
Kellie Lerner
William V. Reiss
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
bpersky@labaton.com
hsalzman@labaton.com
ebelfi@labaton.com
gasciolla@labaton.com
klerner@labaton.com
wreiss@labaton.com

A. Craig Eiland
Attorney at Law
2211 The Strand, Suite 201
Galveston, TX  77550
Telephone: (409) 763-3260
Facsimile: (713) 513-5211
ceiland@eilandlaw.com

J. Burton LeBlanc
Bruce Steckler
Melissa Hutts
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Telephone: (214) 521-3605
Facsimile: (214) 520-1181
bleblanc@baronbudd.com
bsteckler@baronbudd.com
mhutts@baronbudd.com

M. Stephen Dampier
**VICKERS, RIIS, MURRAY AND
CURRAN, L.L.C.**
Post Office Drawer 2568
Mobile, AL 36652-2568
Telephone:  (251) 432-9772
Facsimile: (251) 432-9781
sdampier@vickersriis.com

Gregory P. Hansel
Randall B. Weill
**PRETI FLAHERTY BELIVEAU &
PACHIOS LLP**
P.O. Box 9546
One City Center
Portland, ME  04112-9546
Telephone: (207) 791-3000
Facsimile: (207) 791-3111
ghansel@preti.com
rweill@preti.com

*Attorneys for Plaintiffs and the Proposed
Classes*

**Of Counsel:**

Gerald O. Gussoni, Jr.
Jeffery M. Lynch
Joseph W. Fritz, Jr.
Diana T. A. Hale
1350 Port of New Orleans Place
New Orleans, LA  70130
Telephone: (504) 528-3228
Facsimile: (504) 528-3209
gussonib@portno.com
lynchj@portno.com
fritzj@portno.com
haled@portno.com

*Additional Counsel for Plaintiff
Board of Commissioners of The
Port of New Orleans*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

BOARD OF TRUSTEES OF THE GALVESTON WHARVES; BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS and OSG LIGHTERING LLC on Behalf of Themselves and all Others Similarly Situated

**DEFENDANTS**

See attached

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Glancy Binkow & Goldberg LLP
1801 Ave. of the Stars, Suite 311
Los Angeles, CA 90067     Telephone: (310) 201-9150

**Attorneys (If Known)**

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No     ☐ **MONEY DEMANDED IN COMPLAINT: $_____**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Section 1 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. §§ 1 and 15

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☑ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | |

CV10 2319 COPY

**FOR OFFICE USE ONLY:**   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑Yes
If yes, list case number(s): CV-05-00381-GW-FFM

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)
☑ A.  Arise from the same or closely related transactions, happenings, or events; or
☑ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☑ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D.  Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Louisiana  (Board of Commissioners of the Port of New Orleans) Texas (Board of Trustees of the Galveston Wharves and OSG Lightering LLC) |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| See attached | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
Note: **In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange Los Angeles San Bernardino | Throughout the United States |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Michael Sedeno_     Date  3/30/2010

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

Civil Cover Sheet Attachment

I(a) – Defendants

TRELLEBORG AB; VIRGINIA HARBOR SERVICES, INC. D/B/A SEAWARD; SEAWARD INTERNATIONAL INC.; SEAWARD HOLDINGS, INC.; FENTEK MARINE SYSTEMS GMBH; URETHANE PRODUCTS CORPORATION; MARINE FENDERS INTERNATIONAL, INC.; WATERMAN SUPPLY COMPANY, INC.; NEXTWAVE MARINE LLC; PLASTIC PILINGS, INC.; MARITIME INTERNATIONAL, INC.; FRANK MARCH; ROBERT B. TAYLOR; DONALD MURRAY; PETER NILSSON; WILLIAM ALAN POTTS; GERALD THERMOS; SEYMOUR WATERMAN; ANDREW BARMAKIAN; JOHN DEATS; TOMAS CRAWAACK; PROMAR (A.K.A PROMAR LLC OR PROMAR CORP.); FENDERCARE MARINE SOLUTIONS; JAMES FISHER PLC; THE YOKOHAMA RUBBER COMPANY, LTD.; BRIDGESTONE CORPORATION; BRIDGESTONE INDUSTRIAL PRODUCTS AMERICA, INC. and SUMITOMO RUBBER INDUSTRIES, LTD.

IX. Venue - Section B

List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

| County in this District: | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| **Orange** (Gerald Thermos) <br> **Los Angeles** (Marine Fenders International; Waterman Supply Company, Inc.; Urethane Products Corporation; Seymour Waterman) <br> **San Bernadino** (Plastic Pilings, Inc.; Andrew Barmakian) | **Sweden** (Trelleborg AB; Peter Nilsson) <br> Germany (Fentek Marine Systems GmbH; Tomas Crawaack) <br> **United Kingdom** (FenderCare Marine Solutions; James Fisher PLC) <br> **Japan** (The Yokohama Rubber Company, Ltd.; Bridgestone Corporation; Sumitomo Rubber Industries, Ltd.) <br> **Virginia** (Virginia Harbor Services, Inc. d/b/a SEAWARD; Seaward International Inc.; Seaward Holdings, Inc.; Robert B. Taylor <br> **Louisiana** (Maritime International; John Deats) <br> **Tennessee** (Bridgestone Industrial Products America; Inc.; Frank March) <br> **Delaware** (Donald Murray) <br> **Maine** (William Alan Potts) <br> **West Virginia** (ProMar) <br> **Texas** (Nextwave Marine LLC) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Valerie Baker Fairbank and the assigned discovery Magistrate Judge is Rosalyn M. Chapman.

The case number on all documents filed with the Court should read as follows:

## CV10- 2319 VBF (RCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

============================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
Lionel Z. Glancy (Bar No. 134180)
Glancy Binkow & Goldberg LLP
1801 Ave. of the Stars, Suite 311
Los Angeles, CA 90067

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOARD OF TRUSTEES OF THE GALVESTON WHARVES; BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS and OSG LIGHTERING LLC on Behalf of Themselves and all Others Similarly Situated<br><br>PLAINTIFF(S)<br><br>v.<br><br>TRELLEBORG AB; [See attachment to Summons for additional defendants].<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV10 2319 VBF (RCx)**<br><br>**SUMMONS** |

TO:   DEFENDANT(S): <u>ALL DEFENDANTS (see attached)</u>

A lawsuit has been filed against you.

Within <u>21</u> days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, <u>Lionel Z. Glancy</u>, whose address is <u>1801 Ave. of the Stars, Suite 311, Los Angeles, CA 90067</u>.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: <u>MAR 3 0 2010</u>

By: _____
**CHRISTOPHER POWERS**
Deputy Clerk
*(Seal of the Court)*

SEAL

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

ATTACHMENT TO SUMMONS
Defendants [Continued]

VIRGINIA HARBOR SERVICES, INC. D/B/A SEAWARD

SEAWARD INTERNATIONAL INC.

SEAWARD HOLDINGS, INC.

FENTEK MARINE SYSTEMS GMBH

URETHANE PRODUCTS CORPORATION

MARINE FENDERS INTERNATIONAL, INC.

WATERMAN SUPPLY COMPANY, INC.

NEXTWAVE MARINE LLC

PLASTIC PILINGS, INC.

MARITIME INTERNATIONAL, INC.

FRANK MARCH

ROBERT B. TAYLOR

DONALD MURRAY

PETER NILSSON

WILLIAM ALAN POTTS

GERALD THERMOS

SEYMOUR WATERMAN

ANDREW BARMAKIAN

JOHN DEATS

TOMAS CRAWAACK

PROMAR (A.K.A PROMAR LLC OR PROMAR CORP.)

FENDERCARE MARINE SOLUTIONS

JAMES FISHER PLC

THE YOKOHAMA RUBBER COMPANY, LTD.

BRIDGESTONE CORPORATION

BRIDGESTONE INDUSTRIAL PRODUCTS AMERICA, INC.

1    SUMITOMO RUBBER INDUSTRIES, LTD.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28